Date signed February 22, 2012



DUNCAN W. KEIR
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In Re: | * | |
| TMST, Inc. | * | Case No.    09-17787-DK |
| f/k/a Thornburg Mortgage, Inc., *et al,* | * | Chapter    11 |
| Debtor | * | |
| ************************************** | * | |
| Credit Suisse Securities (USA), LLC | * | |
| | * | |
| Plaintiff, | * | |
| vs. | * | Adversary    No. 09-00574 |
| TMST, Inc., et al | * | |
| f/k/a Thornburg Mortgage, Inc. | * | |
| Defendants. | * | |

## <u>MEMORANDUM OF DECISION</u>

Before the court is the question of division of proceeds from a sale of mortgage servicing rights conducted by the Trustee on February 26, 2010.  The court conducted a three day evidentiary trial on Count IV[1] of the Complaint from February 1-3, 2011 and the parties each submitted post trial briefs and proposed findings of fact.

### I. BACKGROUND

Defendants (comprised of three of the related Debtor entities) TMST, Inc., TMST Home

---

[1] It was determined by the Amended Scheduling Order entered on April 8, 2010, that the initial trial would be limited only to Count IV.

Loans, Inc., TMST Hedging Strategies, Inc. (formerly and at the time of the filing known respectively as Thornburg Mortgage, Inc., Thornburg Acquisition Subsidiary, Inc., Thornburg Mortgage Home Loans, Inc. and Thornburg Mortgage Hedging Strategies, Inc.), filed bankruptcy under chapter 11, title 11 of the United States Code (the United States Bankruptcy Code)[2] on May 1, 2009.  Prior to filing, the Defendants' business consisted of several entities, TMST, Inc. being the largest and only publically traded entity [3]  which was held for income tax purposes as a Real Estate Investment Trust ("REIT").  The remaining Defendants were held as wholly-owned or indirect subsidiaries of TMST, Inc.  TMST, Inc. focused on investing primarily on high quality rated luxury mortgages and TMST Home Loans, Inc. was a taxable REIT subsidiary of TMST, Inc. that acquired, securitized and serviced mortgage loans.  TMST Hedging Strategies, Inc. performed no significant operations at the time of filing.[4]  All Defendants (and the non-Defendant Debtors) were managed by a non-debtor affiliated company known as Thornburg Mortgage Advisory Corporation.

At the outset of the case, Defendants acted as debtors in possession with the rights and powers so provided by Section 1107(a).  Credit Suisse Securities (USA) LLC ("Credit Suisse"), as collateral agent under the pertinent Security Agreement, initiated this Adversary Proceeding (the "Adversary Proceeding") against Defendants on August 28, 2009.

---

[2] All future statutory references will be to the United States Bankruptcy Code at title 11 of the United States Code, unless described otherwise.

[3] TMST, Inc. was delisted from the New York Stock Exchange in December of 2008.

[4] Two additional related corporations filed along with Defendants- Thornburg Mortgage Acquisition Subsidiary, Inc. ("Acquisition") and Adfitech, Inc. ("Adfitech").  At the time of filing, Acquisition performed no business operations.
    Adfitech operated independently from the other Debtors, specializing in providing mortgage loan auditing services to residential mortgage noteholders.  Adfitech's case was initially jointly administered with the Defendants' cases until November 2, 2009 when the Joint Administration was severed as to Adfitech.  Adfitech's chapter 11 plan has been confirmed and the case is now closed.

The Complaint filed by Credit Suisse (hereinafter "Plaintiff") alleged that among the assets Defendants owned and held were certain mortgage servicing rights ("MSRs")[5] and that pursuant to a series of Security Agreements, Servicing Agreements and Override Agreements (collectively referred to herein as the "Transaction Agreements"), Defendants had granted liens and security interests in those MSRs to Plaintiff for the benefit of the Counterparties named in those Transaction Agreements.  According to the Complaint, prior to the initiation of the Adversary Proceeding, the parties had entered into discussions regarding a sale of these MSRs during which a disagreement arose as to the extent of the Plaintiff's lien in the MSRs.

Plaintiff then initiated the instant action in a four-count Complaint.  Plaintiff sought the following relief: (I): An Order Requiring Segregation and Accounting of Cash Collateral; (II) A Declaration that the Security Agreement is a Repurchase Agreement, a Securities Contract and a Swap Agreement, to which the Automatic Stay does not Apply; (III) An Alternative Prayer for Relief from the Automatic Stay; and (IV) A Declaratory Judgment to Determine the Validity, Priority and Extent of the Plaintiff's Security Interest in the MSR Collateral under Section 506 of the Bankruptcy Code.

The original Complaint[6] filed by Plaintiff was accompanied by a combined Motion for Temporary Restraining Order and Preliminary Injunction (the "TRO Motion").  The immediate relief sought by Plaintiff in the TRO Motion was a prohibition upon commingling cash which it

---

[5] In the Security Agreement, the MSR collateral is defined in Section 2.01(ii) as "All of the Companies' Rights from time to time in, under and to the Mortgage Servicing Agreements, Sub-Servicing Agreements and all Servicing Records, solely as the owner of the mortgage servicing rights or rights to receive any payments related to such mortgage servicing rights under such Mortgage Servicing Agreements."

[6] The Complaint has never been amended, but Joel Sher was substituted as Defendant upon his appointment of chapter 11 Trustee to the Defendant corporations, which occurred at a date subsequent to the denial of the TRO Motion.

alleged to be part of its cash collateral from the MSRs. The court held a hearing on the TRO Motion five days after the filing of the Complaint. At that hearing and in their filed opposition to the TRO Motion, Defendants denied any need for emergency relief by Plaintiff and further argued that no showing of likelihood of success on the merits could be found because the documents unambiguously[7] provided that the pledge of the MSRs contained a restriction therefore bifurcating them into interests held solely as "Owner" and interests held as "Servicer" - a distinction discussed in detail later in this Memorandum, but with significance to the TRO Motion because Plaintiff could not demonstrate likelihood of success should the court determine such distinction was relevant to the determination of extent of liens.

The hearing was commenced on September 2, 2009, and after argument by counsel for Plaintiff and Defendants,[8] the court denied the TRO Motion for the reasons set forth on the record.[9] Immediately after the denial of the TRO Motion, the Committee filed a formal Motion to Intervene, to which Plaintiff objected. The court held a hearing on the scheduling of the case and the Motion to Intervene on October 15, 2009.[10] In granting the Motion to Intervene, the court acknowledged the very direct economic outcome of the case on the Committee because of the anticipation of

---

[7] Indeed both parties maintained throughout the proceedings that the Transaction Agreements unambiguously and without need for reference to parol evidence, supported their respective interpretations of the security interest grants.

[8] The court also permitted counsel for the Committee for Unsecured Creditors to state a position, though at the time the Committee was an interested party in the main bankruptcy proceedings, but not a party to the Adversary Proceeding litigation.

[9] The Transcript of the September 2, 2009 hearing is part of the court's record and appears at docket entry 19 in the docket of this Adversary Proceeding.

[10] The Transcript of the October 15, 2009 hearing is part of the court's record and appears at docket entry 33 in the docket of this Adversary Proceeding. In granting the Motion to Intervene the court strongly cautioned the Committee to avoid duplicate efforts that would result in unnecessary compensation.

liquidation of the assets of Defendants through the chapter 11 case, but also recognized the ongoing litigation by the United States Trustee to have a chapter 11 trustee appointed in the Defendants' bankruptcy cases.

At that same hearing, on October 15, 2009, the court determined, after discussion with counsel, that the initial trial would be held solely on Count IV of the Complaint in order to first determine the respective interests of the parties in the MSRs. The original trial was set to commence on June 23, 2010. Subsequent to that scheduling conference and ruling on the Motion to Intervene, the court granted the United States Trustee's request for the appointment of a chapter 11 trustee in the bankruptcy cases of all related Debtors, except for Adfitech (for which the request had been voluntarily withdrawn by the United States Trustee). Upon the appointment of the Trustee, Joel Sher, the substituted Defendant, and for other considerations and consent agreements by the parties, the original trial date was postponed.

During the discovery period and after the Trustee was appointed, the Trustee began to market for sale the same MSRs which were at issue in the Adversary Proceeding. The court approved an Emergency Motion to Approve Sale Procedures on December 18, 2009. After consensual resolution of various objections by other financial institutions (not Plaintiff), the court approved an Order Authorizing Sale on February 16, 2010 (the "MSRs Sale"). The Order recognized that Plaintiff consented to the sale of the MSRs free and clear of liens and that the MSRs Sale was without prejudice to its asserted rights described in the Adversary Proceeding and further that any rights in the proceeds would be subject to those rights and claims. The Trustee filed his Report of Sale of Servicing Portfolio on March 19, 2010, reporting the purchaser as Select Portfolio Servicing, Inc. ("SPS")[11] for a purchase agreement price of $79,302,557.53, plus reimbursements of

---

[11] SPS is a corporate affiliate of Plaintiff.

unpaid servicing fees and advances in the net amount of $16,882,896.95.[12]  After payment to

brokers and certain cure payments, the Trustee is holding $95,572,152.81.[13]

## II. JURISDICTION

The Court initially finds that its decision of the matter before it will constitute a final order

pursuant to 28 U.S.C .§ 157 at such time as the requirements of Federal Rule of Civil Procedure

54(b), incorporated by Federal Rule of Bankruptcy Procedure 7054, are completed.  A final order

by the bankruptcy judge under that Section is constitutionally permitted after application of the

principles set forth in the decision of the United States Supreme Court in *Stern v. Marshall,* 131

S.Ct. 2594 (2011).

All parties have stated unequivocally in written filings in this Adversary Proceeding that the

matters raised by the Complaint are "core" under 28 U.S.C. § 157 and thereby indicated their

agreement that the Bankruptcy Court could enter final orders in determining the Adversary

Proceeding.[14]  Further, the decision by this court as to the existence and extent of the lien of

Plaintiff is a decision determining part[15] of the question as to which claimants (Plaintiff as a secured

creditor or the estate for unsecured creditors) hold rights to distributions from funds now held as

part of the bankruptcy estates by the Trustee.  Under prior statutory and even traditional English

---

[12] The amount of $16,882,896.95 is referred to hereinafter as the "Reimbursements."

[13] Subject to the Order Authorizing Sale, the Trustee holds the funds in a segregated interest-bearing account.

[14] Although sometimes referred to as a reference of "jurisdiction," the issue of constitutional authority of a non-Article III judge to enter final orders pursuant to 28 U.S.C. § 157 is not a question of constitutionality of subject matter jurisdiction, a defect of which could not be "cured" by consent.  Subject matter is constitutionally conferred upon the United States District Court by 28 U.S.C. § 1334.  The issue addressed in the opinion in *Stern v. Marshall* is to what extent by reference under 28 U.S.C. § 157, a non-Article III judge may exercise final order power over such matters.

[15] *See* fn 35, *infra.*

6

bankruptcy practice, "summary" power existed in non-article III judicial officers as to such determinations, including allowance of claims of creditors.[16]  The court reviewing this question *sua sponte,* concludes that it has the constitutional authority to enter a final order determining the matter raised in Count IV of the Complaint.

### III.  SUMMARY JUDGMENT

By August 2010, both parties had filed cross motions for partial summary judgment as to Count IV, with joinder by the Committee to the positions taken by the Trustee.  In the Trustee's Answer filed to the Complaint, several affirmative defenses were raised.[17]  The cross-motions for summary judgment addressed both the parties' positions regarding their rights under the documents as drafted, as well as the Plaintiff's request that the affirmative defenses asserted by Defendants be found without merit and decided in the Plaintiff's favor.  The cross motions for summary judgment focused on Count IV of the Complaint and the court ultimately was required to determine the extent of rights which the documents[18] comprising the transaction of securitization of the MSRs included.

The initial document to be scrutinized was the Security Agreement, dated April 1, 2008 (the "Security Agreement") which was the only document attached to the Complaint by Plaintiff.  The

---

[16] Plaintiff filed a proof of claim in the bankruptcy case asserting a secured claim for the entire proceeds of the MSRs in question.  The decision of the Adversary Proceeding in effect is as to whether the claim is secured.

[17] Some affirmative defenses could be characterized as "boilerplate" affirmative defenses, such as "the failure to state a cause of action."  However, other affirmative defenses were the Trustee's attempts at invalidating the entirety of the Plaintiff's security interest. The court addressed the Plaintiff's motion as to these affirmative defenses in its ruling on summary judgment.  *See infra*.

[18] As in most securitization transactions, there are numerous documents detailing the transaction.  These documents included the Security Agreement, a Servicing Agreement of same date, and two Override Agreements intended to extend, override and supplement provisions contained in the original Transaction Agreements.  All of these documents were included as evidence in the trial.

ultimate question being whether the grant of rights in the Security Agreement provided Plaintiff with a security interest in all of the interests held by the Trustee in the MSRs, or just those rights held "solely as owner" (the word "solely" having appeared in several sections of the Security Agreement and its meaning existing as a strong point of contention between the parties). Plaintiff acknowledged that it was not averring that the Security Agreement gave it *per se* the right as Servicer of the MSRs (there were qualifications put on any entity to act as Servicer), but Plaintiff did argue that it held as collateral the entire right to designate the Servicer both as Seller and Servicer. Plaintiff, therefore, argued that all proceeds held by the Trustee for the sale of the MSRs were subject to its security interest.

Defendants, on the other hand, in addition to arguing that the insufficient description of the collateral in the Transaction Agreements invalidates them in their entireties, argued alternatively that the word "solely" must be read to have meaning that therefore excluded from the Plaintiff's liens any of the estates' interests in the MSRs that were not held "solely as owner."[19]

Defendants also argued that the Security Agreement was unambiguous. However, Defendants believed that the Security Agreement contained distinct bundles of rights of which the right to act as Servicer held substantial value. Defendants argued that under the contract the term "Seller" meant "solely as owner" and therefore the references to "Servicer" were separate rights which had not been granted in the collateral to Plaintiff. Defendants argued that if one conceded that the security interest was held as Owner of the MSR rights, such right would still require a process of replacing a current Servicer, a process which was of value, and not part of the security grant.

---

[19] While Plaintiff argued that the contract was unambiguous and that it held all rights both as Owner and Servicer, it also argued that should the court find the document ambiguous, the extrinsic evidence would support its interpretation of the broader security grant.

The court found in its determination of the cross motions for summary judgment that the Defendants' Motion[20] would be denied in its entirety and the Plaintiff's Motion would be granted in part and denied in part.  In a lengthy oral ruling delivered on October 21, 2010, the court determined that the Security Agreement was an unambiguous integrated agreement.  Therefore the intent of the parties as to the extent of the lien conferred thereunder is not a matter upon which parole evidence is permissible under the Federal Rules of Evidence.  That finding is reiterated and fully adopted in the findings stated in this Memorandum, after trial of the matter.

For the reasons stated by the court in its decision of the Plaintiff's Motion for Partial Summary Judgment, the court decided and continues to hold that Plaintiff was granted a perfected security interest in the rights of Defendant TMHL as "Seller" as described in specific Transaction Agreements among Wells Fargo, TMHL as seller and TMHL as Servicer, dated March 1, 2002 and subsequently on August 1, 2007) (*Plaintiff's Exhibits* 5 and 6).   The court further decided and continues to hold that Plaintiff was not granted and does not hold a security interest in rights held by Defendant TMHL as "Servicer" under those documents.  In its decision of the cross motions for summary judgment, the court decided that within the rights of TMHL as Servicer, and therefore not encumbered by the lien held by Plaintiff, are those funds received by the Trustee from SPS as the Reimbursements.  Accordingly, the bankruptcy estates hold the Reimbursements received from SPS upon the closing of the MSRs Sale, free and clear of the lien right of Plaintiff.  For the reasons expressed in its decision of the Plaintiff's Motion for Partial Summary Judgment, the Plaintiff's request for a declaratory judgment in its favor as to that portion of the monies held by Plaintiff, was and will be denied.

Though in their cross motions on summary judgment the parties had submitted insufficient

---

[20] The Committee filed a Memorandum joining the Defendants' Motion.

evidence for the court to make a determination as to the extent of the Plaintiff's lien in the proceeds of the price paid by SPS, the court was able to address in full all nine of the affirmative defenses raised by Trustee in his Answer to the Complaint, the denial of which was requested as part of the Plaintiff's Motion for Partial Summary Judgment.  The first affirmative defense raised was the failure to state a cause of action.  The court quickly dispensed with that argument and found that Plaintiff had adequately stated a cause of action and indeed the court had found that a security interest had been granted by the Transaction Agreements.  The second and third affirmative defenses were merely different ways of framing the entire dispute raised by the Complaint and Answer.  In summary, they both addressed the issue of whether Plaintiff had asserted a security interest that exceeded or was inconsistent with the documents upon which Plaintiff was relying.

The fourth and fifth affirmative defenses were also somewhat similar.  The fourth affirmative defense raised the issue of whether Plaintiff should be barred from a determination of the extent of the security interest granted because the counterparties had materially breached the Transaction Agreements.  The fifth affirmative defense asserted that there had been no meeting of the minds at the time of execution of the Override Agreement or Security Agreement and such documents could therefore not be found to be enforceable.

The court disagreed and found the documents did create valid and enforceable security interests.  The court found that TMHL as grantor had ratified the security interest after the alleged breach and therefore the enforceability could not be attacked by alleged contract defenses occurring and known to a ratifying party prior to the ratification.

The remaining affirmative defenses raised issues of estoppel, failure of consideration, standing and a reservation of right to assert any further defenses or claims that may be warranted after discovery.  None of these defenses were found to support a grant of summary judgment in favor of Defendants.

# IV. ANALYSIS

Accordingly, partial summary judgment having been granted to Plaintiff, the remaining issue under Count IV of the Complaint is a determination as to what part of the price received by the Trustee from the MSRs Sale is payment for rights held by the Trustee in its capacity as "Seller" under the Servicing Agreements (hereinafter "Seller's Rights") or as additional proceeds from the value of rights of the Trustee as "Servicer" (hereinafter "Servicer's Rights").   It is this question that the court now determines from the evidence introduced at trial.

Plaintiff asserts that all of $78,689,255.86 received by the Trustee based upon the price of 77 basis points bid by the buyer SPS are proceeds of the sale of Seller's Rights.  Its initial argument is based upon evidence that is offered to demonstrate that it was the intended result when entering into the Security Agreement and that various persons believed and stated that the Counterparties under the Override Agreement, for whom Plaintiff is the collateral agent, would likely receive all proceeds from a sale of the MSRs, except for reimbursement of advances.  *See e.g., Plaintiff's Exhibit* 32.  Whereas Defendants, in the Proposed Findings and Conclusions of Law, direct the court to parts of the trial record to support that the expressions of the officers of the Debtors differ from the conclusions drawn by the Counterparties as to the rights to all proceeds of a potential sale of the MSRs.

The testimony at trial of Messrs. Siffer, Houston, and Canton, as well as the documentary evidence including the Override Agreement, demonstrate well beyond a preponderance standard,[21]

---

[21] Plaintiff, in seeking a declaratory judgment and as a creditor asserting a secured claim that is disputed by the Trustee, bears the burden of proof by a preponderance of the evidence. *See e.g.,* 10B Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE § 2770 (Civil 3d 1998).

Furthermore, in *Raleigh v. Illinois Dept of Revenue*, 120 S.Ct. 1951, 1955 (2000), the Court held that the party having the burden of proof in a non-bankruptcy forum, has burden of proof in the context of an objection to claim.  Because Plaintiff herein would have the burden of proof in asserting its contract claim in a non-bankruptcy forum, Plaintiff has that burden in this

that the Counterparties wanted and believed that they received a lien upon all parts of the MSRs covered by the Override Agreement and that the officers of the Debtors assumed that was what was granted by the Security Agreement, except for the Reimbursements.[22]  However, that extrinsic evidence of intent is inapposite to the question before the court, except perhaps to rebut any notion that Plaintiff knew at the time of the making of the Security Agreement that Plaintiff had something less in right than Plaintiff now claims.

As found by the court, in its ruling upon the cross motions for summary judgment, the Security Agreement is an unambiguous agreement.  It clearly and unambiguously provides that only rights of TMHL under the Servicing Agreements, held as "owner" are impressed with the lien.  As previously decided,  the Security Agreement unambiguously granted a valid security interest in the Seller's Rights and not in the Servicer's Rights.  Therefore the extrinsic testimony of the Plaintiff's witnesses and documents as to what each party thought was granted is not considered on that question.  Nor is that evidence relevant or at least at all persuasive as to how much of the combined undifferentiated price SPS paid to the Trustee for both the Seller's Rights and the Servicer's Rights was attributable to (and therefore proceeds of) the separate rights sold as one package by the Trustee.

The views expressed by this part of the evidence as to the parties' expectations were not based upon any particular facts, experience or expertise of the witnesses that were introduced into evidence at trial, as to what value would be placed by a buyer in the market place as to the

---

Adversary Proceeding.  *Compare also In re Gates,* 214 B.R. 467, 472 (Bankr. D. Md. 1997).

[22] During the summary judgment phase, Plaintiff asserted rights to the Reimbursements received by the Trustee at settlement.  Plaintiff has not formally conceded the correctness of the court's finding that those separate funds received in addition to the purchase price for the MSRs, were outside the lien of Plaintiff.  Nevertheless, Plaintiff now argues that the statement of TMST, Inc.'s CEO that Plaintiff would receive the proceeds of the MSRs, excluding the Reimbursements, is probative evidence as to the scope of the lien.

respective types of rights held by TMHL under the Servicing Agreements. Instead it appeared the statements simply assumed the lien of Plaintiff extended to all rights of TMHL under the Servicing Agreements, (except for the reimbursement of advances) which assumption the court in its ruling upon the cross motions for summary judgment has rejected.

Some of the most probative evidence was a portion of the testimony of the Defendants' expert, Dr. Thomas J. Healy. Although the court did not permit the witness to give an opinion on the allocation of the price as between Seller's Rights and Servicer's Rights, the court finds that Dr. Healy's description of how the market place would view a purchase of the rights was very credible. Based upon the Plaintiff's assertion that the Servicing Agreements may provide to the Seller an absolute right to terminate the Servicer, Dr. Healy observed, "When we get to that we're really going to be talking about the economic benefit of veto power."[23] Recognizing that now the parties are disputing the rights of the Seller under the Servicing Agreements to terminate the Servicer without cause (and without compensation to the Servicer),[24] Dr. Healy further testified that "this boils down to the fact that as a buyer, I would not touch this portfolio without the consent of every party involved, the seller in particular."[25] It becomes apparent from all of the evidence that the market for buying and selling these types of mortgage servicing rights does not separately sell or value Seller's Rights and Servicer's Rights. The combined rights are what buyers are willing to purchase. Thus there are no historical sales figures of similar rights, nor other market records that can be brought to bear on the allocation question now before the court.

---

[23] *Unsealed Transcript Feb. 2, 2011,* at page 172, lines 19-22.

[24] Discussed *infra*.

[25] *Unsealed Transcript Feb. 3, 2011*, at p. 88, lines 12-15.

So what does the court use to make the necessary determination?  Counsel for the Trustee, in his opening statement expressed his opinion that "I also believe, Your Honor, at the end of both plaintiff's case and defendants' case, the Court will, as the trier [of] [sic] fact, have the burden that every trier of fact, be it a jury or a judge, has to do.  And that's to bring that person's years of experience, business judgment, and sense of how parties should or do deal with each other to figure out the allocation."[26]

The Plaintiff's counsel made a similar statement when arguing against qualifying the Defendants' expert as he asserted: "And I respectfully submit that there is a gentleman in robes who can interpret contracts and we do not need expert testimony."[27]  The evidence that the court considers is as suggested by the Plaintiff's counsel, the transaction, the contracts, the underlying documents including the Servicing Agreements which define the Seller's and Servicer's Rights, as well as the market place as described in Dr. Healy's testimony.

If as asserted by Plaintiff, the Seller's Rights include the right to terminate the Servicer without cause and without compensation to the Servicer, the Servicer's Rights are not worth purchasing.  This is obvious as to business sense and as testified to by Dr. Healy.  The value of the right to act as servicer depends entirely on the acquirer being able to perform the servicing and collect the servicing fees.  If this right is subject to extinguishment, there is no reliable prospect of any opportunity to earn and receive any benefit from acquired servicer's rights.  Thus it becomes apparent that the paramount Seller's Rights to designate a substitute servicer is the most valuable of the MSRs, to the extent that such right to terminate and substitute servicer exists unfettered in the hands of the Seller.

---

[26] *Unsealed Transcript February 1, 2001*, at p.32, lines 2-8.

[27] *Unsealed Transcript February 2, 2001,* at p.190, lines 10-12.

However, the termination provisions as to the Servicer that are in the Servicing Agreements in evidence are also the subject of dispute between the parties. As described in the recitals to the Servicing Agreement[28] at the time of making that Servicing Agreement, TMHL owned and serviced certain residential mortgage loans. The Servicing Agreement named TMHL in two distinct capacities. TMHL as "Seller" of the mortgage loans and TMHL as the "Servicer" of the Securitized Loans under the Agreement. TMHL as Seller would from time to time convey mortgage loans into trusts with servicing rights retained, for the purpose of the transferred loans becoming Securitized Loans as defined in the Agreement. By the Agreement, TMHL as Seller assigns its rights and delegates its obligations to the trustee of the trust(s) such assigned rights and obligations not to include ("exclusive of") the Seller's rights and obligations as owner of the servicing rights related to the Securitized Loans. The Agreement further recites that under the trust agreement, the Master Servicer[29] is required to supervise the servicing. The Master Servicer is an additional signing party to the Agreement. Pursuant to Section 2.02 of the Servicing Agreement, TMHL as Seller contracts with TMHL as Servicer for the servicing of the Securitized loans.[30]

The disagreement presented at trial is as to the effect of the provisions in the Servicing Agreement which allow the Seller to terminate the Servicer without cause. This right is part of the collateral rights encumbered by the lien held by Plaintiff. Section 8.02(a) of the Servicing Agreement provides in part:

> In addition, with the prior written consent of the Master Servicer, the Seller or its designee may terminate this Agreement with respect to all of the Securitized Loans,

---

[28] *See Plaintiff's Exhibit* 5, at p.4 (p.1 of the Servicing Agreement).

[29] *See id.* Wells Fargo Bank Minnesota, National Association is named as Master Servicer under the Servicing Agreement.

[30] *See id* at pp.17-18 (pp.14-15 of the Servicing Agreement).

without cause, provided, that the Seller or its designee gives the Servicer 30 days' notice.

*Plaintiff's Exhibit 5*, at p.47 of the exhibit (p.44 of the Security Agreement). This Subsection further provides that in exercising the right to terminate without cause, Seller shall comply with the termination procedures set forth in Section 9.01.[31]

Section 9.01(b) states in part:

> (b) as a result of termination of the Servicer without cause by Seller pursuant to Section 8.02 hereof, the Seller shall appoint a successor having the characteristics set forth in clauses (I) and (ii) of Section 7.01 and which shall succeed to all rights and assume all responsibilities, duties and liabilities of the Servicer under this Agreement simultaneously with the termination of the Servicer's responsibilities, duties and liabilities under this Agreement.

*Id.* at p.48 (p.45 of the Security Agreement). Subsection 9.01 further provides that upon the appointment of a successor Servicer and written acceptance by that successor, "whereupon such successor servicer shall become fully vested with all rights, powers, duties, responsibilities, obligations and liabilities of the Servicer, with like effect as if originally named as a party of this Agreement. *Id*. at p.50 (p.47 of the Security Agreement).

Defendants argue that these provisions do not allow the Seller (with approval of the Master Servicer) to change the Servicer under the Servicing Agreement without cause and thus any purchaser of the Seller's rights (which rights are impressed with the lien of Plaintiff) cannot do so. According to the Defendants' argument this alleged lack of right to in effect substitute the servicer renders Seller's portion of the sold servicing rights virtually valueless. The basis for the interpretation sought by Defendants is the language which states that the Seller may terminate "the

---

[31] Section 8.02 further sets forth that upon termination, the Servicer shall be paid all unreimbursed servicing fees, and advances. This is consistent with the court's ruling upon the Plaintiff's Motion for Partial Summary Judgment that the Reimbursements received by the Trustee in this case at time of the sale of the MSRs, were property of TMHL as Servicer and not by Owner/Seller and therefore not impressed with the lien of Plaintiff.

Agreement" without cause.  From this provision Defendants assert that if that right is exercised, the Servicing Agreement is completely extinguished and thus no servicing rights thereunder remain. Defendants then infer that thereupon no rights would exist to be subject to the lien of Plaintiff.

Plaintiff argues to the contrary that a termination without cause under Section 8.02 would not destroy all rights, directing the court's attention to the language requiring Seller to appoint a successor and the vesting of such a successor servicer with the rights and obligations of the original Servicer.

This disagreement, of course, has not been resolved by actual events, as the MSRs Sale was for both "Seller" and "Servicer" rights held by TMHL under the Servicing Agreement and substitution of the successor servicer has apparently occurred thereafter under the consent provisions of the Servicing Agreement and not through termination of Servicer without cause.

The court finds the Defendants' interpretation of these provisions less likely than that presented by Plaintiff.  The preponderance of the evidence leads the court to conclude that the overarching intended effect of the provisions is to allow the Seller, with consent of the Master Servicer, to terminate the rights of the named Servicer under the Agreement, subject to residual rights to reimbursement.  If Seller exercises that right of termination, Seller must appoint a qualifying successor servicer, which successor succeeds to the rights and duties as set forth in the Servicing Agreement.  To find that a termination without cause simply destroys the Servicing Agreement would read out of the Servicing Agreement the provisions that provide for this requirement of a successor that, upon acceptance, obtains the Servicer's rights and obligations.

To the extent that the language relied upon by Defendants creates an ambiguity, the court finds from the entire body of the evidence that the intent of the parties is substantially likely as stated by Plaintiff.  However, as Dr Healy testified, the existence of this language issue casts a sufficient cloud on the right of the Seller to terminate a Servicer without cause and by that means

transfer the servicing rights to a new substitute servicer, that unless such sale of the servicing rights were by consent of all parties, he would "not touch it." Logic and business experience dictates therefore that consent of the Servicer, an opportunity or right that is not impressed with the Plaintiff's lien, has an added value component that is part of the price for a sale by consent, of all servicing rights. Nonetheless the court finds that this right to consent held by Servicer, is not equal to, nor substantially as valuable as the rights of Seller expressed in the Servicing Agreement to effectuate a change in Servicer, without obtaining the consent of the Servicer. Given the court's finding as to the likelihood of interpretation of the discussed provisions, the court finds that the value to the sale transaction of obtaining Servicer's participation and consent by including Servicer's rights under Servicing Agreement as part of the consensual sale of all rights equates to 5% of the price (excluding the Reimbursements) paid by the buyer, SPS.

Defendants also argue that only 63 basis points of the 77 basis points paid by SPS as buyer can be attributed to the sale of the MSRs and that the difference paid was for goodwill, an intangible asset not included in the collateral pledged under the Security Agreement. This argument is founded upon Dr. Healy's testimony that the market value of the servicing rights as determined by formulas used by him to appraise such portfolios of rights, was only 63 basis points.[32] Defendants aver that the winning bid by SPS was enhanced due to a strategic premium in worth that the acquired rights created for SPS because it was to enable the account parties to collapse the trusts of mortgage loans and capture value that allegedly would result from such action. The court finds this argument unpersuasive and unsupported.

Dr. Healy's hypothetical valuation is subject to dispute both as a result of the fact that even the lowest of the competing bids for the MSRs Sale was higher than his hypothetical valuation and

---

[32] *Sealed Transcript, February 3, 2011,* at p.132, lines 5-8.

the higher market study evaluation testified to by Mr. Garland. Even if the court were to find as a fact that Dr. Healy's valuation was the one done correctly (which finding the court does not make), the court finds no basis to conclude that any amount paid in excess of a market study valuation must be attributable to a separate asset of the seller (estate of TMST, Inc.). Goodwill is defined extensively by *Black's Law Dictionary*. Several descriptions include: "The excess of cost of an acquired firm or operating unit over the current or fair market value of net assets of the acquired unit.. . . [or] [t]he ability of a business to generate income in excess of normal rate on assets, due to superior managerial skills, market position, new product technology, etc." *Blacks's* also notes that "For accounting purposes, goodwill has no basis unless it is purchased. In the purchase of a business, goodwill generally is the difference between the purchase price and the value of the assets acquired."

Here there was presented no evidence that SPS was acquiring the MSRs and some mark-up for the goodwill attributed to TMHL in a business or marketplace. If a particular buyer has a unique situation not generally held by other potential buyers, that makes assets offered for sale appear more valuable to that particular buyer than to others that make up the general marketplace, the extra price that the particular buyer may pay to obtain the assets is not automatically goodwill. Fair market value is commonly described by courts as the amount a willing buyer would pay and what a willing seller would accept absent duress, but it does not follow that the difference between the two highest bidders' offers is a separate asset known as goodwill.

In *Romley v. Sun Nat'l Bank* (*In re Two S Corp.*), 875 F.2d 240 (9th Cir. 1989), the United States Court of Appeals for the Ninth Circuit addressed such an issue. In that case, the assets (a dry cleaning business) had been sold for below the total amount of claims of secured creditors. Although the secured creditors worked out an allocation of the proceeds between them, the chapter 11 trustee argued that the assets had been sold for an amount which included an intangible

component that was not subject to the secured creditors' liens. The trustee based his argument on the fact that appraisals of the assets he had obtained showed the value of the assets as significantly lower than that for which they were sold.  The trustee requested an evidentiary hearing upon the value of the assets, however, the bankruptcy court held that the approval of the sale was conclusive evidence of the value of the assets and entered partial summary judgment in favor of the creditors. The partial summary judgment was certified as a final judgment for appeal, the 9th Circuit BAP affirmed the bankruptcy court and the appeal reached the Court of Appeals.  The Court denied the trustee's argument that after a court approved sale, the court should have any requirement to consider other valuation evidence (such as the appraisals), as the Court found "a commercially reasonable sale is the best evidence of valuation."  *Id.* at 243 (citations omitted).

The trustee then attempted to argue that the bankruptcy court should have considered an affidavit by the purchaser stating that the price paid exceeded the pure liquidation value of the assets because the intent of the purchaser was independently negotiating for leases of the property where the business was located and also perhaps for tax depreciation advantages.  *Id.*  In response, the Court explained:

> The purchaser's motives for purchasing the equipment and for paying the price that he did are, therefore, irrelevant. Purchasers have many motives for choosing to buy an item at a given price. These motives do not affect the item's value. By definition, when there has been a fair sale the purchase price reflects the fair market value of the asset.

*Id.* at 244 (citing the *Black's Law Dictionary* definition of Fair Market Value as "[t]he amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.").[33]

---

[33] In *In re Yellowstone Mountain Club, LLC*, 410 B.R. 658 (Bankr. D. Mont. 2009), the bankruptcy court distinguished the *Romley* case.  In *Yellowstone Mountain Club*, the trustee was

The evidence simply does not support the Defendants' theory and the court finds that the assets purchased were the bundle of rights under the Servicing Agreement and did not include a separate category of asset, *i.e.* goodwill. Finally Defendants appear to assert an equitable unclean hands argument which Defendants put forward based upon the alleged intent of Plaintiff and the Counterparties to have SPS convey parts of the acquired rights to the Counterparties holding exposure on certain portfolios so as to enable the Counterparties to collapse the trusts.

This concept was explained in the testimony of Mr. Siffer, a witness for Plaintiff.[34] By way of much simpler explanation than such a complicated transaction may warrant, because of market conditions, owning the whole of the loans (including the servicing rights), would lessen their exposure to loss because of a deficiency in the value of the loan. The process of putting the loan back together was described as "collapsing the trust" and Mr. Siffer explained to the court that SPS purchasing the MSRs and even re-selling to certain counterparties may be good for all parties involved, including TMST, Inc. Assuming that SPS was expecting to use some of the acquired rights in this fashion (and indeed testimony reflects it sold some rights to a counterparty very soon after the MSRs Sale for this possible benefit), Defendants provide no cognizable legal theory for carving out from the proceeds some or all of the amounts paid.

### V. CONCLUSION

The court has determined herein and in the cross motions for summary judgment, that Plaintiff holds a security interest in the rights as Owner, which is equal to 95% of the proceeds of

---

trying to prevent Credit Suisse (the secured lender) from obtaining a valuation of its security interest, arguing that it might chill bidding. The Court noted the difference between a case like *Romley* in which a specific asset was being purchased, as opposed to the package that particular debtor was attempting to market in sale, which would have included its entire business-goodwill, general intangibles, etc..

[34] *Unsealed Transcript, February 1, 2011*, at p.48, line 3- p.52, line 23.

the MSRs Sale, (not including the Reimbursements) including interest earned since and attributable

to such.  However, such amount does not include the amounts collected by the Trustee for the

Reimbursements.  The Reimbursements, plus 5% of the proceeds from the price, including interest

earned thereupon, are held by the Trustee free and clear of the Plaintiff's lien.[35]

        An Order in accordance with this Memorandum will be entered herewith.

---

[35] Defendant Trustee has not brought a motion under Section 506(c) in the bankruptcy case as to the costs incurred by the estate in selling the MSRs.  The Order (I) Authorizing Sale of the Servicing Portfolio Free and Clear of Liens, Claims, Encumbrances And Interests and (II) Authorizing and Approving the Assumption And Assignment of Certain Executory Contracts contained the provision:

> The Trustee and the Collateral Agent reserve any and all rights, claims and defenses with respect to any right of the Trustee to surcharge the Proceeds of the Servicing Portfolio pursuant to, *inter alia*, Section 506(c) of the Bankruptcy Code, if and to the extent the Collateral Agent may later be determined to hold a lien on or security interest in the Proceeds of the Servicing Portfolio, nothing contained herein shall be construed as a consent by the Collateral Agent to such a surcharge, or an acknowledgment by the Trustee that the Collateral Agent holds a lien on or a security interest in the Servicing Portfolio or its Proceeds, and entry of the Sale Order shall otherwise be without prejudice to any and all rights, claims and defenses asserted or to be asserted by the parties in the adversary proceeding docketed as *Credit Suisse Securities (USA) LLC, as Collateral Agent v. TMST, Inc., f/k/a Thornburg Mortgage, Inc., et al.*, Adv. Proc. No. 09-00574 (DWK).

*Order* entered February 16, 2010, docket entry 665 in *In re TMST, Inc.,* 09-17787, at p,8 ¶7.

The decision in this Adversary Proceeding of Count IV of the Complaint as expressed in this Memorandum of Decision and an Order to be entered as provided above, does not consider or decide any application of Section 506(c).

Furthermore, the Trustee has filed a separate adversary proceeding (adversary proceeding 11-340 DWK) against the Plaintiff and other defendants asserting rights to damages, *inter alia*, from alleged breaches of the Override Agreement under which the security interest disputed in the present Adversary Proceeding arose.  Included in adversary proceeding 11-340 DWK are assertions by the Trustee that claims filed in the bankruptcy case by Credit Suisse and others, should be disallowed.  This Memorandum of Decision in the instant Adversary Proceeding does not decide any issue as to whether Plaintiff herein or the Counterparties for whom Plaintiff is the collateral agent, hold enforceable debts from the estates that are secured by the security interest held by Plaintiff as declared in this Memorandum of Decision.

cc:    Counsel for Plaintiff
       Counsel for Trustee
       Counsel for the Committee of Unsecured Creditors
       Office of the United States Trustee

**END OF DECISION**